## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## ASHEVILLE DIVISION
## 1:23-CR-00051-MR-WCM

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | MEMORANDUM AND |
| | ) | RECOMMENDATION |
| JAMES LEWIS SANFORD, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

This matter is before the Court on Defendant's Motion to Suppress (the "Motion to Suppress," Doc. 26), which has been referred to the undersigned pursuant to 28 U.S.C. § 636 for the entry of a recommendation.

### I.    Relevant Procedural Background

On June 21, 2023, James Lewis Sanford ("Defendant") was indicted on one count of knowingly possessing a firearm and ammunition after having been convicted of at least one crime punishable by imprisonment for a term exceeding one year, in violation of 18 U.S.C. § 922(g)(1). Doc. 1.

On June 28, 2023, Defendant made an initial appearance, and, on June 29, 2023, counsel was appointed for him.

On July 7, 2023, Defendant was arraigned and entered a plea of not guilty.

On August 7, 2023, Defendant filed the Motion to Suppress and a supporting memorandum. Doc. 26. The Government responded. Doc. 30.

1

The undersigned conducted a hearing on the Motion to Suppress on September 20, 2023. See United States v. Taylor, 13 F.3d 786, 789 (4th Cir. 1994) ("When material facts that affect the resolution of a motion to suppress ... are in conflict, the appropriate way to resolve the conflict is by holding an evidentiary hearing after which the district court will be in a position to make findings.").[1] During that hearing, the Government called Deputy Andrew Sumner and Deputy James Petty, both of the Cleveland County Sheriff's Department. The Government also submitted, without objection, video footage from the deputies' body-worn cameras.[2] Defendant did not call any witnesses or present any evidence but had previously attached a copy of an investigative report to his Motion to Suppress. Doc. 26-2.

Following the hearing, the parties filed, at the undersigned's direction, supplemental briefs addressing whether arguments regarding the admissibility of confessions under 18 U.S.C. § 3501 may or should be considered in the context of a pretrial motion to suppress rather than at the time of trial. See Docs. 41, 44.

---

[1] During the hearing, the Government was represented by Special Assistant United States Attorney Annabelle Chambers. Defendant appeared with his attorney, Howard Anderson. Mr. Anderson was subsequently allowed to withdraw, and Defendant is now represented by different counsel, Ben Scales.

[2] Deputy Sumner's complete body-worn camera footage was submitted as the Government's Exhibit 1 and Deputy Petty's complete body-worn camera footage was submitted as the Government's Exhibit 2. Excerpts of footage from both cameras were introduced as the Government's Exhibit 3.

## II.    Factual Background

Based on the information of record and as presented during the hearing, the undersigned finds the relevant facts to be as follows:

### A. Beginning of the Encounter

At approximately 5:38 a.m. on June 9, 2023, Deputy Sumner responded to a call concerning a vehicle stopped in the roadway. He located a vehicle that was stopped in the center of one lane of a two-lane road and that was blocking the entire lane of travel. The vehicle's engine was not running. Deputy Sumner observed Defendant asleep in the driver's seat, which was reclined into the back seat area. Deputy Sumner also observed a firearm on Defendant's lap.

Deputy Petty arrived on the scene shortly thereafter.

Both deputies approached the vehicle on the driver's side and Deputy Sumner repeatedly tapped on the driver's side window with his flashlight to awaken Defendant, while Deputy Petty shined a flashlight into the car. Both officers had their firearms drawn at the time.

When Defendant did not wake, Deputy Petty holstered his firearm and began striking the roof of the car with his hand and yelling for Defendant to wake up.

Defendant began to stir, at which point Deputy Petty again drew his firearm. The deputies identified themselves as being with the Sheriff's Department and ordered Defendant to put his hands up, not to grab the

3

firearm in his lap, and to unlock and open the car door. Defendant did not immediately open the door and the deputies repeated their orders.

Defendant complied and, in the process, Deputy Petty re-holstered his firearm, told Defendant that he was going to reach into the vehicle, and then reached in and removed the gun from Defendant's lap, and placed it on the roof of the vehicle.

Deputy Sumner then re-holstered his firearm as well.

### B. Defendant's Initial Statements

Defendant was initially told to step out of the vehicle, but he remained seated. The deputies began asking Defendant questions, including how he came to be stopped in the road, to which Defendant responded that his car had "cut off." They also asked Defendant if he had tried to call anyone or if he had drunk or taken anything.

Deputy Sumner next asked if Defendant had any identification. While Defendant was looking for his identification, Deputy Petty asked if there were "any other weapons in the car." Defendant responded, "that wasn't in my car—I found it on the ground" and that there were not any other weapons in the vehicle.

Defendant was unable to locate his identification and was asked for, and provided, his name and date of birth.

4

Defendant then stated that when he first pulled up "there was a little bag . . . I grabbed the little bag, I looked at the little bag. There was a whole bunch of s*** in there. I don't know what all was in there."

Deputy Sumner asked where the bag was at the moment and Deputy Petty asked if the bag to which Defendant was referring was a backpack in the front passenger area of the vehicle. Defendant responded that the bag was a blue one, and asked if the deputies minded if he looked "back here" (apparently meaning in the rear passenger area of the vehicle). Deputy Petty told Defendant to go ahead and step out and that the deputies would get the bag for Defendant.

Defendant did not step out though.

Deputy Petty asked, "Was the gun in the bag?" Defendant replied, "No… I picked up the gun."

Defendant then stepped out of the vehicle.

### C. Interaction with Deputy Petty

Deputy Sumner went to his patrol vehicle to run both the firearm and Defendant's information.

Meanwhile, Deputy Petty kept talking with Defendant at Defendant's vehicle. He asked Defendant where he was going and where he was living and patted down Defendant.

Deputy Petty also returned to the topic of the bag Defendant had mentioned previously and asked where Defendant had found the bag. Defendant seemed confused and responded by asking "what blue bag?"

Deputy Petty told Defendant that if everything was "on the up and up," "we will get you out of here as soon as we can without your car being stuck in the middle of the road."

He also allowed Defendant to sit in the driver's seat of the vehicle.

### D. Arrest of Defendant

At approximately 5:56 a.m., Deputy Sumner exited his patrol vehicle and returned to Defendant's vehicle. At that time, Deputy Petty informed Deputy Sumner that Defendant was "passed back out snoring." Deputy Petty reported what Defendant had told Deputy Petty regarding his travels, and that Defendant did not appear to be making sense regarding the "blue bag."

At approximately 5:58 a.m., Deputy Sumner had Defendant exit the vehicle and perform a field sobriety test. Deputy Sumner observed that Defendant had "red glassy eyes," "a slight slur to his speech," and "a slight sway to his step...." Deputy Sumner told Defendant that it appeared Defendant had drunk or taken something and asked Defendant if he would take a roadside breath test. Defendant said that he had been drinking the night before but that "you can look at me and tell I'm not drunk." Defendant refused to take a roadside breath test.

6

At approximately 6:00 a.m., Deputy Sumner advised Defendant that he was being placed under arrest for possession of a firearm by a felon, and handcuffed Defendant. Defendant immediately asked: "possession of firearm by a felon … for what?" to which Deputy Sumner replied, "You had a firearm in your lap when we rolled up, boss. That would be in your possession." Defendant objected and appeared to say that a firearm had not been in his lap, to which Deputy Petty responded, "We came up on you and you were sleeping in your seat with a firearm in your lap. It's all on body cam, buddy, and we have the firearm as well."

Defendant was then placed in Deputy Sumner's patrol vehicle.

### E. Statements Made After Defendant's Arrest

Subsequently, at 6:03 a.m., Defendant asked what would happen to his vehicle and Deputy Sumner stated that it would likely be towed.

Defendant made some type of response, which is inaudible on the video recordings, to which Deputy Sumner replied, "Well, you're drunk behind the wheel – you stopped by the side of the road for one. You got a gun in your lap and you're a felon. You know you ain't supposed to have one of them."

Defendant then stated, "I stopped on the side of the road because my car shut off" and that he was not doing anything wrong.

Deputy Sumner replied, "Well, you had a gun and you're a felon, that's pretty wrong."

7

Defendant responded that, "if there was gun in there," someone had put it on his lap and set him up.

Deputy Sumner asked, "they did?" and Defendant replied, "I'm telling you, somebody set me up."

Deputy Sumner asked, "Your doors were locked, too. Did you know that?"

Defendant replied, "If you was able to open up my door, anybody was able to open up my door."

Deputy Sumner responded that he would submit the gun to the lab for fingerprint testing and stated that "when it comes back with your fingerprints on it, we'll see how that story holds up in court."

Defendant replied, at approximately 6:04 a.m., "I'm telling you, bro. I was in there asleep, I did not do nothing. I did not have no gun. I did not have none of that. I was in there asleep. If anybody did that, they set me up."

### F. Discussion Concerning the Vehicle's Key

At approximately 6:13 a.m., Deputy Sumner approached Defendant, who was still seated in Deputy Sumner's patrol vehicle, and asked where the key for Defendant's car was located. Defendant did not answer, and Deputy Sumner asked if Defendant did not know where the key was. Defendant responded that the key had been in the ignition, that he was asleep, that someone came along while he was asleep and "did something," and that he "didn't even know."

8

Deputy Petty then asked Defendant if he knew how long he was "stuck there broke down" or if he remembered what time it was. Defendant did not respond. Deputy Petty then said if they could find the key, they could at least pull Defendant's vehicle off the road and possibly not have to tow it. Defendant suggested they could back the car off the side of the road, but Deputy Petty responded that they would need the key to put the vehicle in neutral.

Defendant seemed to indicate that he had the key in his pocket and Deputy Petty checked Defendant's pockets. As he was searching, Deputy Petty asked if it was a single key and Defendant said it was. No key was found on Defendant's person.

Defendant then asked if the deputies could remove his handcuffs and Deputy Petty said they could not be removed at that point. He then asked Defendant where Defendant thought the key was and Defendant said it should be in the ignition "or something like that," and Deputy Petty said they would check one more time.

At approximately 6:24 a.m., Deputy Sumner transported Defendant from the scene.

Deputy Sumner testified that Defendant would have been advised of his <u>Miranda</u> rights after he arrived at the police station. However, Defendant was not advised of his <u>Miranda</u> rights while at the scene.

## III. Discussion

"An incriminating statement 'made during a custodial interrogation will be suppressed unless police advise the defendant of his rights under <u>Miranda v. Arizona</u>, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and the defendant knowingly, intelligently, and voluntarily waives those rights.'" <u>United States v. Ivey</u>, 60 F.4th 99, 112 (4th Cir. 2023), <u>cert. denied,</u> No. 22-7784, 2023 WL 6378334 (Oct. 2, 2023) (internal citations omitted).

Here, Defendant moves to suppress all statements he made to law enforcement before being advised of his <u>Miranda</u> rights; since Defendant was not given <u>Miranda</u> warnings while at the scene, Defendant's request pertains to all statements he made to Deputy Sumner and Deputy Petty. Defendant also argues that any statements he made to law enforcement were involuntary.

### A. Custodial Interrogation

#### 1. The Beginning of the Encounter Until Defendant's Formal Arrest

The initial question is whether Defendant was in "custody" prior to being placed under formal arrest. <u>United States v. Leggette</u>, 57 F.4th 406, 410 (4th Cir. 2023) (if a defendant "is not 'in custody,' then statements made during an interrogation remain admissible, even if the defendant were not given <u>Miranda</u> warnings") (citing <u>United States v. Leshuk</u>, 65 F.3d 1105, 1108 (4th Cir. 1995)).

"Miranda warnings are not required when a person is questioned during a routine traffic stop or stop pursuant to Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)." Leshuk, 65 F.3d at 1108 (citing Berkemer v. McCarty, 468 U.S. 420, 437–421 (1984)). "A so-called Terry stop allows a police officer whose observations lead him to suspect that a particular person has committed or is about to commit a crime to detain the person briefly in order to investigate the circumstances that provoke suspicion." United States v. Johnson, 599 F.3d 339, 345 (4th Cir. 2010) (internal citations and quotations omitted).

In this case, Defendant contends that he was effectively in custody from the moment he woke, such that the requirements of Miranda applied from the onset of his encounter with Deputy Sumner and Deputy Petty.

"When deciding whether a defendant not under formal arrest was in custody—and thus if the Miranda requirements apply—a court asks whether, 'under the totality of the circumstances, 'a suspect's freedom of action [was] curtailed to a degree associated with formal arrest.'" United States v. Hashime, 734 F.3d 278, 282 (4th Cir. 2013) (internal citations omitted). The Fourth Circuit has explained that:

> This inquiry is an objective one, and asks whether "'a reasonable man in the suspect's position would have understood his situation to be one of custody.'" United States v. Colonna, 511 F.3d 431, 435 (4th Cir. 2007). In other words, the court considers whether "a

reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." United States v. Jamison, 509 F.3d 623, 628 (4th Cir. 2007).

Facts relevant to the custodial inquiry include, but are not limited to, "the time, place and purpose of the encounter, the words used by the officer, the officer's tone of voice and general demeanor, the presence of multiple officers, the potential display of a weapon by an officer, and whether there was any physical contact between the officer and the defendant." United States v. Day, 591 F.3d 679, 696 (4th Cir. 2010). Also pertinent are the suspect's isolation and separation from family, see United States v. Griffin, 7 F.3d 1512, 1519 (10th Cir.1993), and physical restrictions, United States v. Griffin, 922 F.2d 1343, 1347 (8th Cir.1990).

Id. at 282–83 (internal citations omitted).

Here, the encounter began as a Terry stop. Deputy Sumner was investigating a report of a vehicle stopped in the roadway when he and Deputy Petty came upon Defendant sleeping in a vehicle in the middle of the road with a firearm in his lap. While Defendant did awake to the sight of two deputies with their firearms drawn just outside the window of his vehicle, the deputies' actions and their initial detention of Defendant were reasonable under the circumstances; the deputies were approaching an unknown individual who was in a locked vehicle with a weapon in plain view on a public road. See United States v. Samuel, No. 1:14-CR-351, 2015 WL 1442884, at *4 (E.D. Va. Mar. 26, 2015), aff'd, 674 F. App'x 322 (4th Cir. 2017) ("Neither the fact that [the officer] drove up to defendant's vehicle with her lights on, nor that she approached

12

defendant with her weapon drawn crossed the line to convert defendant's stop into an arrest. The Fourth Circuit has frequently held that police officers may draw their weapons for protection without transforming an otherwise valid Terry stop into an arrest.") (citing United States v. Perate, 719 F.2d 706, 709 (4th Cir.1983); United States v. Seni, 662 F.2d 277, 283 (4th Cir. 1981)); see also Magwood v. Fowler, No. 2:19-cv-02277-RMG-MGB, 2021 WL 3410482, at *7 (D.S.C. May 19, 2021) ("In sum, there is no case that establishes that pointing a weapon at a suspect believed to be armed during an investigatory stop, where that suspect is not yet secure, violates the Fourth Amendment.").

Likewise, the detention of Defendant did not evolve into a custodial situation for purposes of Miranda prior to the time that Defendant was formally placed under arrest.

In that regard, the encounter took place in the early morning on a two-lane road and lasted for approximately twenty minutes before Defendant was placed under formal arrest. During much of this time, Defendant was allowed to remain seated in his own vehicle. As the stop progressed, the deputies attempted to assess the circumstances they had encountered, including Defendant's possible impairment and the presence of a firearm. In doing so, the officers performed routine investigatory tasks, including asking Defendant about his personal information and the circumstances of his disabled vehicle,

conducting a field sobriety test, and checking information about Defendant and the firearm.

Further, two officers were present, and both were courteous to Defendant.

Finally, though the deputies' weapons were drawn initially, their weapons were holstered immediately after the firearm found in Defendant's lap was secured. The deputies' weapons were never redrawn and any physical contact between the deputies and Defendant was minimal and reasonable, such as the pat down of Defendant.

Consequently, the totality of the circumstances indicates Defendant was not in custody for Miranda purposes before being placed under arrest by Deputy Sumner. See United States v. Johnson, 599 F.3d at 345 ("In this case, Officer Bannerman's conduct was entirely consistent with simply trying to ascertain who Johnson was and what he was doing. Prior to his formal arrest of Johnson, therefore, Officer Bannerman can be said at most to have subjected Johnson to a Terry stop."); Leggette, 57 F.4th at 413-414 ("Miranda warnings are not required every time an individual has their freedom of movement restrained by a police officer. Nor are they necessarily required every time 'questioning imposes some sort of pressure on suspects to confess to their crimes.' Instead, they are required only when a suspect's freedom of movement is restrained to the point where they do not feel free to terminate the encounter

and the circumstances reveal the same inherently coercive pressures as the type of station house questioning at issue in <u>Miranda</u>.'") (internal citations omitted).[3]

## 2. Events at the Time of and After Defendant's Arrest

Defendant was in custody for purposes of <u>Miranda</u> after he was placed under formal arrest. The question regarding this portion of the encounter, then, is whether he was "interrogated."

For purposes of <u>Miranda</u>, "interrogation includes not only express questioning but also its functional equivalent -- words or actions on the part of the police ... that the police should know are reasonably likely to elicit an incriminating response from the suspect." <u>United States v. Ivey</u>, 60 F.4th 99, 112 (4th Cir. 2023), <u>cert. denied,</u> No. 22-7784, 2023 WL 6378334 (U.S. Oct. 2, 2023) (internal citations and quotations omitted).

"In determining whether a suspect was subject to interrogation, the focus is on the perception of the suspect not the police." <u>United States v. Bennett</u>, No. 2:15-cr-20-BO, 2016 WL 1259905, at *1 (citing <u>Rhode Island v. Innis</u>, 446 U.S. 291, 301 (1980)). "'Any statement given freely and voluntarily without any compelling influences is, of course, admissible.'" <u>Id</u>. (quoting <u>Miranda v.</u>

---

[3] It is not necessary to determine whether any of the deputies' questions prior to Defendant's formal arrest constituted an interrogation for <u>Miranda</u> purposes because, even if they did, since Defendant was not in custody at the time, <u>Miranda</u> warnings were not required. <u>Leggette</u>, 57 F.4th at 410.

15

Arizona, 384 U.S. 436, 478 (1966)); Ivey, 60 F.4th at 112 (explaining that "'spontaneous or volunteered statements that are not the product of interrogation or its functional equivalent are not barred by Miranda, even if the defendant is in custody when the statements are made'") (quoting United States v. Williams, 16 F. App'x 90, 92 (4th Cir. 2001) (per curiam)).

### a. Statements Made at the Time of Arrest (5:56 a.m. – 6:00 a.m.)

When Deputy Sumner informed Defendant that he was being arrested for possession of a firearm by felon, Defendant asked, "for what?" The deputies then both responded and explained that Defendant had a firearm in his lap when they arrived on the scene.

These statements by the deputies were not made to elicit a response from Defendant but rather were made in response to Defendant's question and for the purpose of explaining the basis for the charge. See Ivey, 60 F.4th at 112 (a defendant's "own questions to the officers after he was apprehended were clearly not made in response to interrogation"); United States v. Payne, 954 F.2d 199, 202 (4th Cir. 1992) ("We thus reject appellant's argument that statements by law enforcement officials to a suspect regarding the nature of the evidence against the suspect constitute interrogation as a matter of law. It simply cannot be said that all such statements are objectively likely to result in incriminating responses by those in custody.").

16

### b. Statements Made After Defendant's Arrest (6:03 a.m. – 6:04 a.m.)

As noted, at 6:03 a.m., Defendant asked what would happen to his vehicle and Deputy Sumner stated that it would likely be towed. This exchange, like Deputy Sumner's response to Defendant's question about the charge when Defendant was initially arrested, did not constitute an interrogation.

Communication between Deputy Sumner and Defendant, however, did not stop at that point. Rather, after Deputy Sumner told Defendant that the vehicle would likely be towed and Defendant made some type of response, Deputy Sumner and Defendant appeared to argue about the basis for the charge, with Deputy Sumner telling Defendant that, as a felon, he was not supposed to possess a gun, and informing Defendant that he planned to submit the firearm for fingerprint testing, presumably to confirm that Defendant had handled the weapon.

Given that Deputy Sumner had previously informed Defendant of the basis for the charge, his continued engagement with Defendant about the circumstances surrounding the charge was reasonably likely to elicit an incriminating response from Defendant. As such, his statements to Defendant constituted an interrogation.

17

The undersigned notes that the specific statements by Defendant during this time frame – that Defendant did not have a gun and that if a gun had been found in the vehicle he had been set up – appear to be exculpatory, or consistent with at least some of Defendant's prior statements. However, for purposes of Miranda, "no distinction may be drawn between inculpatory statements and statements alleged to be merely 'exculpatory.'" Miranda, 384 U.S. at 477. Rather, "statements merely intended to be exculpatory by the defendant are often used to impeach his testimony at trial or to demonstrate untruths in the statement given under interrogation and thus to prove guilt by implication. These statements are incriminating in any meaningful sense of the word and may not be used without the full warnings and effective waiver required for any other statement." Id.; see also U.S. v. Molina-Gomez, 781 F.3d 13, 24 n.8 (1st Cir. 2015) ("It is irrelevant that [defendant's] responses to the drug-trafficking interrogation were not incriminating"); Rosa v. McCray 396 F.3d 210, 224 (2d Cir. 2005) ("Under the Supreme Court's definition of "incriminating response," any answer Rosa gave that was responsive to Arroyo's question would have been an incriminating response"); Dukes v. Hunt, 952 F.Supp. 276 (E.D.N.C. 1996) (defendant's statement made to police without Miranda warnings should not have been admitted even if the statement was "not inculpatory").

Therefore, the undersigned will recommend that these statements be suppressed.

### c. Statements Concerning the Key

Defendant's later statements regarding the location of the key were, to some extent, related to a routine purpose: the vehicle was blocking one lane of travel on a two-lane road and needed to be moved. See <u>State v. Abdallah</u>, 911 F.3d 201, 214 (4th Cir. 2018) (considering whether, following a defendant's invocation of the right to remain silent, interrogation resumed and making a distinction between "routine questions" and those which the officer "should reasonably be aware that the information sought is directly relevant to the substantive offense charged.") (internal quotations and citations omitted).

However, given Defendant's earlier assertions that someone must have accessed the vehicle and set him up, information regarding the key was also relevant to the firearm charge.

In addition, though Defendant was not formally charged with driving while being impaired, the deputies were clearly investigating such a charge, and facts concerning the key would also have been pertinent to that investigation.[4]

_____

[4] During the hearing, Deputy Sumner testified that Defendant had been arrested for both possession of a firearm by a felon and driving while impaired, though the video footage reveals that Defendant was arrested only on the firearm charge.

It is also noteworthy that both deputies asked multiple questions regarding the location of the key and that Defendant was silent in response to Deputy Sumner's first question and, after Deputy Sumner repeated his question, again made statements to the effect that someone came along while he was asleep and did something.

Under these circumstances, the undersigned is persuaded that the deputies' questions regarding the location of the key to Defendant's vehicle were reasonably likely to elicit incriminating statements and therefore these questions constituted an interrogation for purposes of <u>Miranda</u>.

### B. Voluntariness

Additionally, Defendant argues that his statements, both prior to and after his arrest, should be suppressed because, "given Mr. Sanford's allegedly intoxicated state," his statements "were likely involuntary." Doc. 26-1, at 5. <u>See</u> <u>Dickerson v. United States</u>, 530 U.S. 428, 444 (2000) ("The requirement that <u>Miranda</u> warnings be given does not, of course, dispense with the voluntariness inquiry.").[5]

---

[5] Generally, voluntariness is considered under the Fifth and Fourteenth Amendments. <u>See</u> <u>Dickerson</u>, 530 U.S. at 433 ("Over time, our cases recognized two constitutional bases for the requirement that a confession be voluntary to be admitted into evidence: the Fifth Amendment right against self-incrimination and the Due Process Clause of the Fourteenth Amendment."). Defendant also argues that the voluntariness of his statements should be analyzed under 18 U.S.C. § 3501, a provision which was passed to "overrule <u>Miranda</u>," <u>id.</u> at 437, and which sets out factors to be considered when analyzing the voluntariness of an individual's self-

"Voluntariness depends on a determination of whether the defendant's will has been overborne or his capacity for self-determination has been critically impaired." <u>United States v. Baalerud</u>, No. 3:14–cr–00188–MOC, 2015 WL 1349821, at *6 (W.D.N.C. Mar. 25, 2015) (rejecting argument that defendant made "uninformed, involuntary, and coerced" statements at his home and at the police department) (citing <u>United States v. Pelton</u>, 835 F.2d 1067, 1071 (4th Cir.1987)).

Here, at the beginning of Defendant's encounter with the officers, Defendant was asleep in his car. The officers tapped on the window with a flashlight, shining a flashlight into the car, knocking on the roof, and yelling to wake Defendant. After several attempts, the officers woke Defendant. Later, Defendant fell asleep in the driver's seat. When Deputy Sumner asked Defendant to step out of the vehicle, Deputy Sumner noticed he appeared to sway slightly, smelled of alcohol, and that his eyes were red and glassy.

However, Defendant also stated that while he had consumed alcohol the evening before, he was not currently impaired. Additionally, Defendant was

---

incriminating statement for purposes of admissibility in federal criminal trials. <u>See</u> 18 U.S.C. § 3501(a) & (b). In <u>Dickerson</u>, however, the Supreme Court found that "<u>Miranda</u> announced a constitutional rule that Congress may not supersede legislatively." <u>Id</u>. at 444; <u>see also</u> <u>United States v. Hardy</u>, 999 F.3d 250, 253 n.2 (4th Cir. 2021) ("It is unclear whether aspects of § 3501(a) survived <u>Dickerson</u>."). Here, even assuming that aspects of § 3501 remain applicable, the undersigned's conclusion regarding the voluntariness of Defendant's statements remains the same.

able to provide his identifying information and information about his travel and the malfunctioning of his vehicle, and was able to exit his vehicle and perform the field sobriety test. Defendant was also able to walk to Deputy Sumner's patrol car without assistance and was able to engage in conversations with the deputies.

Under these circumstances, the undersigned is not persuaded that any statements made by Defendant were involuntary because Defendant was impaired. <u>Accord</u> <u>United States v. Fields</u>, No. 5:08–CR–395–FL–1, 2009 WL 3029726, at *6 (E.D.N.C. Sept. 21, 2009) (explaining "indicia of [a] defendant's mental capacity" includes "the defendant's ability during the interrogation; to have a conversation; to speak logically with fluid speech that is not slurred; to remember historical facts; to provide detailed information; to recognize the people around him; and to remain alert and awake while being interrogated…") (internal citations omitted); <u>United States v. Snow</u>, 14 F. App'x 218, 220 (4th Cir. 2001) (noting that "'the mere fact that one has consumed alcoholic beverages does not mean that he is so intoxicated as to make his confession involuntary.' Rather, the question is the same as the coercion inquiry—whether the confession was a product of rational intellect and free will" and finding that the defendant's statements pre- and post-<u>Miranda</u> warnings were voluntary) (quoting <u>Boggs v. Bair</u>, 892 F.2d 1193, 1198 (4th Cir.1989)); <u>see also</u> <u>United States v. Walker</u>, 607 F. App'x 247, 257 (4th

Cir. 2015) (finding defendant's intoxication did not preclude defendant's knowing and intelligent waiver of his <u>Miranda</u> rights and stating that defendant's "responses and actions were more in line with an individual attempting to avoid detection than one who was unaware of what he was doing or saying").

## IV.    Recommendation

The undersigned respectfully **RECOMMENDS**:

1) that Defendant's Motion to Suppress (Doc. 26) be **GRANTED IN PART** and that the statements made by Defendant after his formal arrest and starting at approximately 6:03 a.m. be suppressed with the exception of Defendant's question regarding what would happen to his vehicle,; and

2) that the Motion to Suppress otherwise be **DENIED.**


Signed: November 2, 2023


W. Carleton Metcalf
United States Magistrate Judge

23

## Time for Objections

The parties are hereby advised that, pursuant to Title 28, United States Code, Section 636(b)(1)(B), written objections to the findings of fact, conclusions of law, and recommendation contained herein must be filed within **fourteen (14)** days of service of same.  **Responses to the objections must be filed within fourteen (14) days of service of the objections.**  Failure to file objections to this Memorandum and Recommendation with the presiding District Judge will preclude the parties from raising such objections on appeal.  See Thomas v. Arn, 474 U.S. 140 (1985).